UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

————————————————————

JOSEFINA DOE, et al.,

    Plaintiffs,                    CIVIL ACTION NUMBER:

      vs.                          2:24-cv-9105-MEF

U.S. DEPARTMENT OF HOMELAND        Oral Argument
SECURITY, et al.,

    Defendants.

————————————————————————

    Frank R. Lautenberg Post Office and Courthouse
    Two Federal Square
    Newark, New Jersey  07102
    October 28, 2024

B E F O R E:                    THE HONORABLE MICHAEL E. FARBIARZ,
                                UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

    LOWENSTEIN SANDLER LLP, BY:
    GAVIN J. ROONEY, ESQ.
    One Lowenstein Drive
    Roseland, New Jersey  07068

Lisa A. Larsen, RPR, RMR, CRR, FCRR
Official Court Reporter
Lisa_Larsen@njd.uscourts.gov
(973)776-7741

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

UNITED STATES DISTRICT COURT
*Newark, New Jersey*

**A P P E A R A N C E S**: (Cont'd.)

    LEGAL SERVICES OF NEW JERSEY, BY:
    SHIRA WISOTSKY, ESQ.
    P.O. Box 1357
    Edison, New Jersey  08818

    CRIMMIGATION CLINIC
    HARVARD IMMIGRATION & REFUGEE CLINICAL PROGRAM
    TIFFANY J. LIEU, ESQ.
    6 Everett Street
    Suite 3106
    Cambridge, Massachusetts  02138

         appeared on behalf of the plaintiffs; and

    UNITED STATES DEPARTMENT OF JUSTICE
    OFFICE OF IMMIGRATION LITIGATION, BY:
    KEVIN HIRST, ESQ.
    DANIEL SCHUTRUM-BOWARD, ESQ.
    P.O. Box 868
    Ben Franklin Station
    Washington, D.C.  20044

         appeared on behalf of the defendants.

(PROCEEDINGS held in open court before the HONORABLE MICHAEL E. FARBIARZ, United States District Court Judge, on October 28, 2024.)

THE DEPUTY CLERK:  All rise.

THE COURT:  Good afternoon, everyone.  Let's please have a seat.

We are here together in *Doe, et al. vs. United States Department of Homeland Security, et al.*

Appearances, please, for the record, beginning with the plaintiffs.  And specify, if you could, who will be doing the talking.

MR. ROONEY:  Good afternoon, Your Honor.  Gavin Rooney from Lowenstein Sandler on behalf of the plaintiffs, and I will be doing the talking this morning.

I'll allow my co-counsel to introduce themselves.

THE COURT:  Good afternoon to you.

MS. WISOTSKY:  Sarah Wisotsky from Legal Services of New Jersey.

MS. LIEU:  Good afternoon, Your Honor.  Tiffany Lieu from the Harvard Law School Crimmigation Clinic law on behalf of plaintiffs.

THE COURT:  Good afternoon.  Thank you to all of you.

For the defense.

MR. HIRST:  Good afternoon Your Honor.  Kevin Hirst on behalf of the defendants.  I'll let my co-counsel introduce

*United States District Court*
*District of New Jersey*

himself.

MR. SCHUTRUM-BOWARD:  Good afternoon, Your Honor. Daniel Schutrum-Boward on behalf of the defendants.

THE COURT:  Who is going to be doing the talking?

MR. HIRST:  I will be doing the talking, Your Honor.

THE COURT:  Your name is Hirst?

MR. HIRST:  Hirst, Your Honor.

THE COURT:  We are here for the motion of the defendants with respect to the possibility of a transfer of this case to the Western District of Pennsylvania.

Your motion.  I presume you want to be heard.

MR. HIRST:  Yes, Your Honor.

THE COURT:  You can speak from there or from the podium, as you might wish.

(Brief pause.)

MR. HIRST:  Apologies, Your Honor.  Bear with me for a moment.

THE COURT:  No trouble.  Take your time.

(Brief pause.)

MR. HIRST:  Good afternoon, Your Honor.

This case challenges an alleged policy at Moshannon Valley Processing Center.  It is brought on behalf of non-citizens in a putative class housed at Moshannon.  It involves an organizational plaintiff whose alleged injury flows from its representation of non-citizens housed at

Moshannon.

Plaintiffs ask the Court to compel the staff at Moshannon to allow them to appear virtually from Moshannon at their pending state criminal proceedings.  Moshannon is the epicenter of this case and the case should be heard where that facility is located.

First and foremost --

THE COURT:  Can I pause you for a second.

MR. HIRST:  Yes, Your Honor.

THE COURT:  Is a reference you just made to the organizational plaintiffs and -- the opening brief presses the argument that under the the recent *FDA* case from the Supreme Court, the organizational plaintiff, while it's cart-ahead-of-the-horse, arguably doesn't have any Article III standing here.

Does the plaintiff contest that?

MR. ROONEY:  We certainly do contest that, Your Honor. Would you -- do you want me to address that now?

THE COURT:  I just want to know for my mind whether you're going to be coming back to it because Mr. Hirst has opted to begin with that.  It's a relevant question here, but I wanted to understand what your position would be.

Thank you very much, Mr. Rooney.

Mr. Hirst, I didn't mean to cut you off.

MR. HIRST:  No problem, Your Honor.

First and foremost, the claims arose in the Western District of Pennsylvania where Moshannon is located.  As we have alluded to, the entire putative class is there, all the named plaintiffs with the exception of the organizational plaintiff --

THE COURT:  Let me ask you, there are various federal claims here.  There's a First Amendment claim, there's a Sixth Amendment claim, there's an APA claim.

What is the standard gonna be on the Sixth Amendment claim?

MR. HIRST:  I think plaintiffs could speak to that a little better than I could; but from our reading of the complaint, it looks like a confrontation clause argument.

THE COURT:  That's not what I meant.  I've read everything.

The plaintiffs' TRO briefing, frankly, said very little about the governing substantive legal standards here.  It spoke about the impropriety of burdens on, among others, Sixth Amendment rights but said little about the standard under which such burdens are to be judged.

It matters because -- it might matter because each of you implicitly rests on a radically different conception of how the substantive standard works here.

The defendants suggest in a number of places that the substantive standard is gonna turn relatively heavily on

certain factual questions about, for example, facility resource allocation.  And the plaintiffs suggest, at least as I read it, that those things just aren't gonna matter.

So it would be helpful to understand what each parties' sense of the substantive standard is or is not gonna be here with respect to the Sixth Amendment claims, the First Amendment claims, et cetera.

MR. HIRST:  You're right, Your Honor.  Plaintiffs advance a number of constitutional claims, but each of those claims, the harm they allege flows from the imposition of this alleged policy at Moshannon Valley Processing Center.

So we feel in terms of the --

THE COURT:  That's not my question.  My question is whether or not I am going to be needing to weigh factual questions as part of a resolution of the legal question.

The way your brief on the transfer motion looks, it's all facts all the way down.  I'm exaggerating.

The way the plaintiffs' brief looks, it's a clean legal question.  We all understand that, for example, if this were, for instance, a prison case -- I'm not suggesting that's what this is.  It's not.  But if this were a prison case and we were worried about the legitimate penological objective standard, that's usually a very fact-rich balancing.

On the other hand, there are other cases we could arrange substantive standards on a spectrum.  Some of them

have very little in the way of facts that get weighed.

That's why I'm try to get at what the United States' position where -- I suppose you represent the Department of Homeland Security.

MR. HIRST: Correct, Your Honor.

THE COURT: So what the Department of Homeland Security's position is with respect to what the substantive standard is. If this were a prison case, you'd say legitimate penological objectives.

What is the substantive standard for weighing the apparent or alleged Sixth Amendment burden, for example?

MR. HIRST: So I have to confess, I haven't looked into that specifically, the Sixth Amendment case. I know for the First Amendment the right to present -- access the court's claims, I believe the correct legal standard is whether or not the individual has been denied the opportunity to present a meritorious argument in court. So depending on, you know, the factual circumstances of -- that may vary from one detainee to another detainee.

THE COURT: Okay. Keep going, Mr. Hirst.

MR. HIRST: But those aren't the only claims in the complaint. Their overarching complaint deals with whether or not the alleged policy here at Moshannon is arbitrary and capricious.

They cite to things like resources, manpower, that

these things could be done at Moshannon if ICE had the will to do it.  Those are highly factual questions.

THE COURT:  I see that in there.

MR. HIRST:  The answers to those questions are at Moshannon where we're asking --

THE COURT:  I see that.  I see the language of arbitrary and capricious, and I think your adversaries say nonsensical.  All of those arguments, sounds to me, run through factual assertions or suppositions about what's happening at a particular facility.

MR. HIRST:  With regard to the due process claim, I think if we do get beyond a motion to dismiss -- I want to be careful here not to concede that they could survive a motion to dismiss.

I think there's a distinction between saying a claim is adequately pleaded and could survive a motion to dismiss and saying if it does proceed that it still involves factual questions that the Court would need to look into.

Defendants believe for the due process claims that there is a speculative chain of events there.  There's several --

THE COURT:  For example, in the due process claim is the standard a classic *Mathews vs. Eldridge* balancing?

MR. HIRST:  I think that would be potentially part of it.  There's also a question of whether or not there's a

*United States District Court*
*District of New Jersey*

protective liberty interest at stake.  That would be a legal issue.

But in terms of the chain of harms that they're alleging, it is highly speculative, and the facts are gonna vary from one detainee to another.

THE COURT:  Mr. Rooney, is your due process claim bottomed on a *Mathews vs. Eldridge* theory?

MR. ROONEY:  In general, yes.  Although I will say that when we're dealing with criminal proceedings, there are other issues that may come into play.  I say that without waiver of other arguments.  But principally, yes, Your Honor.

THE COURT:  You see the problem with that, Mr. Rooney, which is that the *Mathews vs. Eldridge* test is almost always deeply fact-bound, deeply fact-bound.

Continue.

MR. HIRST:  To Your Honor's point, a lot of that is gonna depend on specific factors -- excuse me, factors specific to each detainee.  A lot of the claims in the complaint are tied to the availability of bond.  Not everybody at Moshannon is even eligible for bond.  A lot of it is --

THE COURT:  I'm not sure I follow that argument.

Every Rule 23 case requires some consideration of the similarity or not between the hypothesized named plaintiffs. I don't know of many contexts in which it happens.  It does happen, but it's an usual case where there is factfinding by

the district judge as to similarity between proposed Rule 23 representative plaintiffs.

Usually that's done on the papers.  And as we all understand, the energy is supplied by the lawyers on those things.  There are instances in which there is some factual disputation but that's a pretty unusual event.

MR. HIRST:  I'm not sure I follow Your Honor's concern.

THE COURT:  Well, your point is about whether -- you're talking implicitly, I took it -- maybe I'm wrong, but I took you to be saying under Rule 23 there may be a lack of commonality between certain plaintiffs because one is subject to a bonding obligation of some sort and one is not.

What I'm saying is that that kind of possible lack of commonality comes up very often in courthouses around the country but is rarely resolved, rarely resolved, on a factual, need-a-hearing kind of basis.

My point is to the extent you're invoking that, you're not really invoking something that's gonna happen at the witness box before a judge, you're invoking something that's gonna happen on the papers, so why should it matter?

MR. HIRST:  I apologize, Your Honor.  I was more speaking to the nature of the due process claims I thought Your Honor was asking about, what you might need to look into to assess some of their due process claims.

THE COURT:  I see.  All right.  Good.  Keep going.

Thank you.

MR. HIRST:  As I was saying, we think -- the claims in this case clearly arose at Moshannon.  They are challenging under any number of constitutional provisions and the APA an alleged policy that they say has been enacted there.  That policy or alleged policy, excuse me, impacts people who are detained there.

All of their named plaintiffs, with the exception of the organizational plaintiff, are housed there.  The entire putative class is housed there.  They're asking for the right to appear virtually from that facility.

So we think, based on the facts of this case, it quite clearly belongs in the Western District of Pennsylvania, Your Honor.

THE COURT:  Which of the defendants here are in the Western District of Pennsylvania?

MR. HIRST:  There are no named defendants in the Western District of Pennsylvania but the witnesses, the people who work for the defendants, who work for ICE, there are several of them who work at the facility, and those are the people on the ground who have the most knowledge of what's going on at that facility day to day.

The detainees who know whether or not they're being impacted by this, they're at that facility.  In terms of the convenience of the witnesses and the parties, you're correct,

Your Honor.  We do not have a named defendant in the Western District of Pennsylvania.  We don't have one in New Jersey, either, Your Honor.

In many of these cases, you know, we have high-ranking officials who get named as named defendants, and in a lot of cases they have, yes, remote supervisory authority over the locations where the events take place but that's not really the nucleus of the case.

Here the nucleus of the case is Moshannon.  There is staff that works for the defendants there, all the named plaintiffs are there, the punitive class is there.  That's where the case belongs.

THE COURT:  Where is the policy made from?  Is the policy made from Moshannon for this particular set of people?  Is it made from somewhere else?

MR. HIRST:  We're not willing to concede at this point that there is a policy.  I've got to stop saying "we."

ICE is constantly evaluating their resources and what they can accommodate on a case-by-case basis.  Given the resource constraints at that facility, in a lot of cases, yes, they are denying virtual appearances for people for their state criminal proceedings.

THE COURT:  But what I'm asking is do you have a position as to whether or not that denial -- I appreciate you not conceding there's a policy.  I assume you're doing that

for any number of reasons, including APA reasons.

But to the extent there's something between a policy and a practice that is alleged, without conceding anything, do you have a sense of whether that set of practices are being chosen, that policy is being chosen in Moshannon or elsewhere?

MR. HIRST:  I think it differs from -- plaintiffs' complaint even concedes as much, that it's different from facility to facility.

THE COURT:  But that doesn't say where it's made. Someone sitting in Washington can decide this is gonna be the approach in place A and this is gonna be the approach in place B.

The question is, is there someone sitting in Moshannon who is making a daily or weekly or yearly decision, or is there someone sitting somewhere else who is making that decision?

MR. HIRST:  I'm sorry.  I misunderstood your question, Your Honor.

I don't know that I could speak to that right now.  I'd need to get back with my client.  We're still early in the litigation, still wading through almost a thousand pages of declarations, so we're still getting caught up.  But I can definitely look into that, Your Honor.

THE COURT:  Okay.  Got it.  Mr. Hirst, anything else?

MR. HIRST:  Yes.  If I could just respond to a few of

the arguments they make in their response.

THE COURT:  Sure.

MR. HIRST:  The private interest factor that they seem to weigh on hardest is plaintiffs' forum preference.  As I think Your Honor held in the *Care One* case, that should be afforded less weight when there's little connection with the operative facts and the chosen forum.

They assert a number of connections between this case and the state of New Jersey, principally that plaintiffs reside there, that they were apprehended there; but none of those are operative facts, Your Honor.

The fact of their residence has no bearing on the claims of this case.  The fact that they were apprehended there has no bearing on the claims in this case.  They are not challenging whether or not ICE had authority to detain them in New Jersey.

What they are challenging is a claim -- is an alleged policy at Moshannon Valley Processing Center that affects people who are detained there.

Then I think the last thing I'd get to, Your Honor, is in terms of public interest factors.  We think the one that weighs strongest in favor of transferring this case is local interest in resolving local controversies.

Here the facility is located in the Western District of Pennsylvania.  They cite facts from the Peacock declaration, I

believe, that shows that more people at that facility were apprehended in New Jersey than any other state and that the class is drawn such that it only impacts --

THE COURT:  I saw the footnote in your brief.  The response from the plaintiff is:  Well, gee, we have tailored our class so it's only about New Jersey.

MR. HIRST:  They have tailored the class so that it's only about New Jersey, Your Honor, but we'll note that there's -- nowhere do they claim that the alleged policy is limited to people with criminal proceedings pending in New Jersey, and their relief is not nearly that tailored, Your Honor.

They are asking for relief on behalf of all detainees. They are asking for court-ordered monitoring for a period of five years in the Western District of Pennsylvania.

I understand that that's how they have drawn the class and they're free to do that, but that does not -- put a thumb on the scale and make it appropriate to litigate this case here rather than the Western District of Pennsylvania, Your Honor.

THE COURT:  All right, Mr. Hirst.  Thank you very much. I appreciate it.

Mr. Rooney, from there or the podium, whatever you prefer.

MR. ROONEY:  I'll come to the podium.  Thank you,

Your Honor.

THE COURT:  Okay.  Mr. Hirst, thank you.

MR. HIRST:  Thank you.

MR. ROONEY:  Thank you for hearing us so quickly.

THE COURT:  Of course.  Mr. Rooney, do we all agree that venue is proper in the Western District of Pennsylvania?

MR. ROONEY:  We're not disputing that venue could be laid in the Western District of Pennsylvania, just like the Government is not also disputing that venue is also proper in this court.  We're just dealing with the 1404 transfer elements.

THE COURT:  I think everyone has indeed agreed that this is a 1404(a) case.

MR. ROONEY:  Yes, exactly.

So let me address the 1404 standards, and let's start with the proposition that what unites the named plaintiffs and what unites the class are they're all defendants in pending criminal matters in the state or municipal courts in New Jersey who need to appear, who need to defend themselves, and who often have to get those resolved before they can get released from the detention facility in Pennsylvania.

These folks are predominantly New Jersey residents. The organizational plaintiff, the American Friends Service Committee, is located here in Newark, New Jersey, and --

THE COURT:  What's the theory gonna be on how that

organizational plaintiff survives the *FDA* decision?

MR. ROONEY:  If you read the *FDA* decision, what it talks about is the expenditure of resources to advocate.  That case was on behalf of a group of anti-abortion doctors and their advocacy group who were arguing that the *FDA* rule allowing free availability of an abortion drug should be invalidated.

So the question then becomes why did they have Article III standing.  They said:  We're spending money on litigation to fight this and we're spending money our lobbyists to fight it, so our resources give us standing.

What the Supreme Court said is, if that's standing, then every organization anywhere anytime will have standing in any circumstances because they will all be able to say that, that they're spending money.

What the Court did do, however, is distinguish its prior precedent, the *Hogan's* matter which involved a different fact pattern where the organization had to go in and expend its own resources in fulfilling its underlying mission with regard to housing assistance to make sure that the policy could be accommodated or a workaround --

THE COURT:  Are you talking about the tester case?  It's not called the tester case.  It involves sending of testers in to test if there's housing discrimination.

MR. ROONEY:  I believe that's the case.  The case is --

I have it in my outline.

THE COURT:  Right.

MR. ROONEY:  But what AFCS *[sic]* does here is they're tasked with helping the folks at Moshannon and elsewhere about --

THE COURT:  Mr. Rooney, Mr. Rooney.

MR. ROONEY:  Yes.

THE COURT:  When you enumerated what the Supreme Court found wanting in *FDA*, you said two things.  The second was lobbying.  The first was advocacy.

Isn't that precisely that what the organization does here?  It does advocacy for clients.

MR. ROONEY:  No.  They advocate for clients in their underlying immigration matters, but that's different than lobbying Congress to change the law or suing the FDA to overturn an FDA decision.

THE COURT:  I appreciate that, but, Mr. Rooney, when you noted what the Supreme Court focused on in *FDA*, you rightly summarize the Supreme Court as having noted two things.  The second was the lobbying but the first was the advocacy, and that's what the organizational plaintiff here does at its core.  It does advocacy.

MR. ROONEY:  It does advocacy but there's a difference between resources being spent to come into this courtroom and argue against a policy versus resources being spent to have

AFSC personnel go into a state court, criminal court, municipal court --

THE COURT:  Do you know of any case where, for example, a law firm gets standing because it has to spend extra money in a case to represent its clients?

MR. ROONEY:  Your Honor, we're here on a venue change motion.  There has been no 12(b)(2) motion filed, and we haven't briefed this issue, so I don't in all honesty think it's a fair question to say do we have a case since this was raised in a very different procedural context.  Let's remember why we're here.

THE COURT:  Mr. Rooney, hang on for a second.  I appreciate that we're not in a 12(b)(2) context.  I got it.

MR. ROONEY:  Yes.

THE COURT:  But your adversary teed up in its brief this problem.  There's no unfair surprise.  It is a plainly serious problem under *Doe*, and I didn't hear a response meaningfully from you when you briefed back.

So while I appreciate we're not in a 12(b)(2) context, on the other hand, this issue is teed up and it's part of what you're relying upon to suggest that the District of New Jersey is appropriate.

So while it's not a 12(b)(2) context, it proves too little to say to me I shouldn't worry about it.

MR. ROONEY:  Well, I'm saying it's premature and the

defendant could have brought a 12(b)(2) motion at the same time it moved for transfer of venue and we'd have a full record on this and we don't.

So I think when you reverse the order, the Court has to accept the complaint as pled, number one.  Number two, on the merits there is a key difference between the sort of advocacy that was at issue in the *FDA* case that the Supreme Court decided and the advocacy that we're pointing to here.

We have, by the way, provided in the record affidavits from each of the AFSC lawyers who explain what they need to do in order to go into a municipal court or a state superior court to try to arrange for public defender representation for their clients.

They're not in the business of handling or defending criminal matters.  That's not their charge; it's not their bailiwick; it's not their competence.  But what they do have to do as a result of this policy, because the clients can't do it, they have to go into those municipal and state courts and try to get in an appearance to get public defender representation counsel.

That squanders their resources which are limited and are devoted by the state of New Jersey that otherwise would be spent on what they're supposed to be spent on which is the actual direct representation of these folks in their immigration proceedings.

So is it advocacy writ large?  Maybe.  But it's not the kind of advocacy the Supreme Court was focused on in terms of the actual litigation to challenge the rule at issue, which is a circular argument that proves too much and would find standing anywhere.  It's a different kind of advocacy.

We're not saying that they have standing because they lobbied the state of New Jersey for a change in statutory law. We're simply saying that these folks, the lawyers on the ground who are being funded by the state of New Jersey, need to go into the state and municipal courts, try to soft-pedal it, see if they can appear when their clients aren't there, and get public defender representation appointed for them because that's a necessary predicate to helping these folks in the immigration --

THE COURT:  Sure, but the premise of what you're saying -- and I appreciate the distinction that this situation lacks the full circularity of the *FDA* situation.

MR. ROONEY:  Yes.

THE COURT:  I agree with that.  But the other problem that the Supreme Court is focused on in the *FDA* decision is the possibility of organizations opting themselves into cases and by doing so displacing the plaintiffs who are most touched by something and essentially pushing ordinary people out of the driver's seat of litigation and having organizational plaintiffs be in the driver's seat, which is a serious

problem.

What you're suggesting is while the *FDA* case is distinguishable because there's no circularity here of a full kind, agreed, what you're not reckoning with is the possibility of discretionary choices by organizational plaintiffs, which is what you're describing; the organizational plaintiff opting to participate in order to help people who are their clients in other contexts, that discretionary choices like that give those organizational plaintiffs a seat at the table in litigation.

That comes very close to what the Supreme Court is talking about, not all the way to full circularity but pretty close to the 2024 Supreme Court decision which I'm duty bound to follow.

MR. ROONEY:  I think it's much closer to the earlier Supreme Court decision that the Supreme Court distinguished in the *FDA* matter involving the housing issues.  Because if you read the opinion, the 2024 opinion describes that in that earlier case that organization had a couple purposes, dual purposes.  One was advocacy to promote changes in the law that were beneficial to minorities seeking fair housing. Number two was actually advising the minority people about their housing choices.

It was that resource diversion for the representation of their underlying minority clients that created the

standing.  That is, I would submit, the same situation we have here with AFSC.

They are there to advocate on behalf of the detained individuals at Moshannon.  That's what they should be doing. Instead of dealing with that, their resources are now diverted into the state and municipal courts of New Jersey to try and line up public defenders to represent these folks.

THE COURT:  I got it.  But, Mr. Rooney --

MR. ROONEY:  I don't see the intellectually honest distinction between the two.  I'm sorry, Your Honor.  I'm trying to just make an argument here, but that's where I am.

THE COURT:  Okay.  Continue.  Mr. Rooney, not the way to go.

MR. ROONEY:  I'm sorry?

THE COURT:  Not the way to go.  Continue.

MR. ROONEY:  Your Honor, turning back to the 1304 analysis, we start with the proposition that the plaintiffs have their choice of forum and that's given deference.  Now, the only time where that's departed from is where the forum has no natural connection to the lawsuit.

That's not this case.  Yes, there's the Moshannon facility in Pennsylvania, we all agree on that, but these are predominantly New Jersey residents all facing criminal charges in the state of New Jersey and they are challenging the policy that prevents them from appearing in those New Jersey state

criminal proceedings.

It has an impact on them as New Jersey residents. They're suing in their home forum.  It has an impact on their family members who are here and who have lost their loved ones and their sources of support.  So I think that the plaintiffs' choice of forum does bear a certain amount of deference.

The second factor, the defendants' choice, has little weight in a situation where we give deference to the plaintiff, which I submit is the present case.  When we look at the convenience of the parties -- I think Your Honor asked my adversary some good questions about who exactly is in the Western District of Pennsylvania.

I'll be happy to share my understanding of the answers to those same questions.  To my understanding, no defendant is located in the Western District of Pennsylvania.  The defendants are either in Washington, D.C., or Philadelphia, Pennsylvania.  Philadelphia is where the regional ICE office happens to be located.

In terms of where the witnesses would be located, I have not heard from the defendants a single name of a single witness who would be located at Moshannon.

We have submitted already 18 separate declarations to the Court.  Those folks fall into two broad categories.  We have seven or eight witnesses that are located in New Jersey and then people that are detained at Moshannon.

So in terms of where the policy is made, it's my understanding that the defendants do not maintain a permanent presence at Moshannon.  At Moshannon there is a contractor who is a non-party that runs the facility under supervision of ICE and under a contract with the government, but the policy would have been set by the government at one of their two facilities, either in Philadelphia or in Washington, D.C.

I'm sorry.  I feel like I misstepped here, and Your Honor made that quite clear.  I just want to apologize.

THE COURT:  Just continue.

MR. ROONEY:  In the heat of the moment.  I encourage the Court if you have further questions to please ask me because I am here to try and help the Court.

So in terms of the familiarity or the local interest in the matter, all that we have in the Western District of Pennsylvania are a handful of pro se prisoner rights cases involving the facility when it was previously a federal penitentiary, which it no longer is.  It's a different kind of facility today operated by a different government agency under a different set of rules.

There's nothing to really suggest that there's a more natural expertise in the Western District of Pennsylvania to handle this matter rather than the District of New Jersey.

In closing, I would just focus --

THE COURT:  Let me ask you this.

MR. ROONEY:  Yes.

THE COURT:  Where did this claim arise?

MR. ROONEY:  I'm sorry?

THE COURT:  Where did the claim arise?

MR. ROONEY:  Fundamentally the claim arises when the individuals detained at Moshannon are asked to appear in court in New Jersey and they are told by the facility at Moshannon: We will not make Zoom or MS Teams available to you.

So I think in all fairness it arises in both jurisdictions, but it certainly starts here because that's the way in which we appear in court.

As we all know, especially in the aftermath of COVID, virtual appearance in court has become routine and commonplace for all of us, so --

THE COURT:  Right, but you're challenging a policy that is applied in a certain place --

MR. ROONEY:  Yes.

THE COURT:  -- that has predictable knock-on effects in another place.  For the purposes of *Jumara* and this body of law, where does that kind of claim arise?

MR. ROONEY:  Well, I think it likely arises first at the defendants' facilities and offices in Washington or Pennsylvania -- or Philadelphia, I should say, where they decide on a policy.  I don't think the policy was set at Moshannon, according to everything that we're aware of,

because the defendants are not located there.

It's implemented when the folks at Moshannon are told to not make Zoom or MS Teams available to the detainees there, and it's also implemented when these folks can't appear in a New Jersey courtroom, because that's ultimately what the injury and what the harm is.

THE COURT:  Neither party -- you agreed, Mr. Rooney, that this is largely -- well, you didn't agree to "largely." You suggested that *Mathews vs. Eldridge* applies here and maybe there are more specific due process issues with respect to Fourth and Sixth Amendment rights.  Maybe.

But are there no questions of resource allocation within the facility that are gonna matter for this case?

MR. ROONEY:  We don't think that there are substantial questions of resource allocation that will matter.

Let's start with the proposition that the facility has three or four what are called virtual courtrooms that are already used for immigration proceedings.  There are 30-some-odd attorney visitation booths which are designed for detained persons to consult with their counsel privately, but those can be easily repurposed and used for purposes of appearing in a New Jersey state court proceeding.

THE COURT:  I understand that, but the word "easily" is in part the crux of the matter, because what your adversary comes back and says in his papers -- I'm talking about

Mr. Hirst's papers -- is, look, this requires resource allocation and it's not unfamiliar to ask about -- for example, under *Mathews vs. Eldridge* one of the three factors laid out by the Supreme Court in that case is what the cost of the process is.

And so if, for example, the defendants argue, "Gee, moving people around within the facility who were subject to criminal proceedings in New Jersey or elsewhere just requires a greater expenditure of security resources inside the facility," that would seem to be the sort of thing that the judge passing on this case needs to think through.  Isn't that right?

MR. ROONEY:  I'm not saying that's wrong.  That's certainly a consideration the Court will need to take into account, and I know it's an argument the defendants are making.

In terms of the allocation of resources, I think we need to think about where that emanates from.  I don't think it emanates from Moshannon.  I think Moshannon will do what the motion in Philadelphia or the folks in Washington, D.C., instruct it to do or, frankly, what this Court, if you retain jurisdiction over the matter, instructs it to do.

There's no particular connection of the resource issue necessarily to the geography of Western Pennsylvania.

THE COURT:  Well, I understand that, but I think we all

understand that if the defendants make that argument, that argument could be -- and it's readily suggested by their papers, I think we all see it.  If they make that argument, there is gonna need to be some factfinding about whether it's real or not.

What kind of resource diversion from their perspective does it take to move somebody from place A to place B, place B where their virtual facilities are, to move them within the facility?

That strikes me as a kind of factual question that is gonna require either declarations that make it all fine or that's gonna require some factual hearings and disputations.

Isn't that something that is better sited near to where the facility is than here?

MR. ROONEY:  Well, I think it would be sited in either place.  Let's remember we're dealing with the United States on one side, which our cases say have unlimited resources, and indigent plaintiffs on the other that I'm representing.

I do tend to think that while some factual development will probably come from the subcontractor that runs the Moshannon facility, the ultimate decision about whether those resources will be allocated, what choices would need to be made to allocate those resources, and the supervision of the facility, that ultimately rests with the offices in Philadelphia or in Washington, D.C.

So I don't think it's as simple as saying all of those facts will come from Moshannon.  I'm not disagreeing that some of them would come from Moshannon.

THE COURT:  Will any facts come from New Jersey?

MR. ROONEY:  Yes.  We have various witnesses that we presented among the declarations we have already filed.  We presented declarations from several academics here at Rutgers and Seton Hall who represent these folks, and they talk about the harms that's being inflicted as a result of the policy.

We have affidavits from folks that were discharged from Moshannon and talking about the harms that they experienced and the difficulties that they encountered as a result of the refusal policy.

As I counted them in preparation for today, I think we had 18 declarants.  At my current count, 7 are located here in New Jersey.  There likely will be an eighth shortly because I understand that one of our named plaintiffs who was given the opportunity to participate in a virtual hearing was able to get their state charges dismissed and will now be able to post bond and hopefully get out of the facility within a few days.

THE COURT:  What about the argument which the defendants come back to a couple times in their papers that says you're asking for an injunction that involves, as you put it in the prayer for relief in the complaint, a minimum of five years of monitoring the facility?

Doesn't that cut pretty strongly in favor of a United States District Court that is nearby?  The federalism concerns here are different.  That is not a state facility.  And if this were a state facility, that would loom large in a different way.

But what we're talking about, five years of supervision of a detention facility -- if you want five years plus of supervision of a detention facility, the number of factual issues that come up in the enforcement -- in the monitoring of a facility for half a decade plus and enforcement proceedings, doesn't that involve extensive predictable systematic five-plus years of factfinding and hearings?  Why would that not take place in the district?

MR. ROONEY:  Well, I can describe what we intend by that, which hopefully will answer at least in part Your Honor's question.

We do not intend that a monitor would be stationed daily or periodically at the Moshannon facility.  That's not at all what we envision.

What we envision is really an auditing of records, that there would be a recordkeeping practice implemented as part of the injunction that would demonstrate from the records that when detained persons needed to appear virtually they are given the opportunity to do so.

That would be kept and recorded.  Those records can be

made available for audit and review on a periodic basis.  That would be the monitor's role.  There's no geographic requirement as to where the monitor is and where those records would need to be reviewed.

They can be made available and transmitted electronically, and the monitor would provide reports to the Court, to the extent the Court retained jurisdiction to oversee the monitoring, to make sure the terms of the injunction were respected.

THE COURT:  Right.  I appreciate that that's what you're saying you envision, but, first of all, that's not the relief you asked for.  You asked for an injunction and a minimum of five years of monitoring its terms.

But more fundamentally, the factor that is about enforcement of judgments in a highly formal sense has very little bearing here because obviously the United States takes the position that it will accede to a federal court order regardless of where it emanates from.  Okay.

But part of the focus on enforcement of a judgment is not just on the sheer question of -- let me step back.

There are very few federal court orders that are not enforceable within the United States virtually anywhere that this *Jumara* factor, as I read it, is in part about the ready enforceability of a judgment.

So there could be complexities in different sorts of

cases with getting hands on property and bringing it into a particular district for a remedy.  The difficulty with ready enforcement here is that the readiness of enforcement in a five-year injunction case, even if it's just offsite monitoring and books and records, that's tricky here in New Jersey versus there in the Western District of PA.

So I'm not sure, even with your kind of non-binding -- and it's not binding but non-binding sense of what kind of remedy you'd seek is five years of monitoring an injunction almost inevitably makes for readier enforcement of that injunction in a place that's near the facility versus here.

It's pretty easy to foresee all kinds of factual disputation over five years as to if you win how an injunction is going or not.  So why is that not a factor that cuts in favor of transfer?

MR. ROONEY:  I wasn't thinking that the monitor would be physically present at the Moshannon facility as opposed to operating remotely, in which case geography wasn't necessarily an issue.

I think we're hypothesizing about issues that might come up in the course of that monitoring.  And, you know, part of the monitoring -- well, my co-counsel points out that part of the monitoring would be what's going on in the New Jersey courtroom, too.  So we would have the monitor not simply looking at what's happening at Moshannon based upon the

recordkeeping there but also working on the New Jersey side of the ledger, too.

Because obviously one needs to match up requests by a New Jersey courtroom to have someone appear virtually with the compliance by the Moshannon facility allowing that person to appear virtually.

So there is an aspect of the monitoring that we'd be looking for that is sited in New Jersey, as well.  So for that reason I would say it's a neutral factor.

THE COURT:  There are references to state law in your complaint, but there are only federal law claims here.  Right?

MR. ROONEY:  We have federal causes of action, right. It's not a diversity case.

THE COURT:  Right.  Mr. Rooney, keep going.  Unless you feel you're at a resting spot.

MR. ROONEY:  Unless Your Honor has further questions -- again, I repeat my --

THE COURT:  Mr. Rooney, you're good, you're good, you're good.  You're okay.

MR. ROONEY:  Okay.  Thank you.

THE COURT:  I assure you, you're good.  Hang on.  Stick close because I have some notes.  I just want to look and see if I had any further questions.

(Brief pause.)

THE COURT:  You think this is distinguishable -- both

parties cite to the *Care One* decision.

How would you distinguish this from the *Care One* decision where there is a focus on the federal case that seeks to enjoin a policy being in the same place where that policy is effectuated from?

MR. ROONEY:  The *Care One* case I'm thinking of involves the National Labor Relations Board matter in Connecticut.

THE COURT:  Right.

MR. ROONEY:  As I understand that case, there was an administrative proceeding ongoing in Connecticut at the time the New Jersey action was filed and when the motion to transfer venue was in turn filed.

What Your Honor basically did in that matter, as I read the case, is to say the natural forum for this is Connecticut. Yes, there is a defendant here, but there is an ongoing trial before an administrative law judge in Connecticut.  So if you're gonna go into court to allege that what he or she is doing is unconstitutional or violates some statute, the District of Connecticut is the proper place for that to happen, not the District of New Jersey.

THE COURT:  Right.

MR. ROONEY:  So the underlying facts really had no connection to the forum.  Here we have, I would submit, a different situation where these are predominantly New Jersey residents who want to sue in their home court.

For the most part, the fact pattern here is that these folks were charged with some sort of criminal offense, either in superior court or municipal court.  When they were released by state law enforcement, ICE was notified and ICE apprehended them and transported them out of the state to Moshannon.

Now they're in a situation where they can't really get out of Moshannon until they resolve those criminal proceedings because that's one of the prime factors that would be considered.  They're in the Catch-22 situation of not being able to appear in New Jersey and get them resolved.

THE COURT:  I get it.

MR. ROONEY:  I think it's a different -- I'm just saying --

THE COURT:  It's a different fact pattern, for sure. There's no doubt that *Care One* is not on all fours.  I agree with that implicit point you're making, but the difficulty I think is that *Care One* cites a number of cases for the proposition that enforcement actions -- excuse me.  Cases to enjoin enforcement proceedings generally around the United States go forward in the same district where that enforcement proceeding is going forward.  That's one of the principles at issue in the *Care One* decision.

MR. ROONEY:  Yes.

THE COURT:  Here we don't have an enforcement proceeding but we have something that is potentially

*United States District Court*
*District of New Jersey*

analogous, which is there's a policy being applied somewhere that like in the *Care One* case is having felt effects elsewhere, but the analogy is that where the policy is being applied is the place where the effort to stop the policy should go forward, not the place where some effects are being felt.

That's why what you started with, which is that in the *Care One* case there was a defendant here in New Jersey, that factor slipped away precisely because the felt effects are potentially less important than the question of where the policy is being applied here or where the enforcement proceeding is happening, as in *Care One*.

How does that analogy not work here?

MR. ROONEY:  I would change the analogy.  The analogy I would focus on is where is the court proceeding today, the prior court proceeding that's in progress?  In *Care One* that was the ALJ trial in Connecticut.

THE COURT:  Right.

MR. ROONEY:  Here we're talking about the criminal proceedings that are presently pending and ongoing in the state and municipal courts of New Jersey.  It is those courts that are commanding the attendance and the presence of our class members.

So we are seeking an injunction from this court in aid of those courts getting our clients into those courtrooms by

virtual means.  Keeping in mind that, as we have pled in the complaint, some of those underlying municipal court proceedings are only virtual.

You actually can't appear in person.  The only way you can appear is on Teams.  So I think the better way to look at this is it's an injunction and aid of those state and municipal court proceedings here in New Jersey.

THE COURT:  But one of the complexities -- and this is pointed out by the defendants.  One of the complexities here is that some of your argument, not all of it, but some of your argument is invoking what you just invoked, which is the burden on state officials and state institutions in New Jersey but they're just not part of the case.

In other words, in invoking harms to the putative class, got it; but there's also invocation of harms to processes and budgets of New Jersey state actors that is a little bit laced through your papers.

MR. ROONEY:  Well, I think one of the 1404 factors is the impact on the community and the local interests in resolving the controversy.  Yes, we don't have parties plaintiff from the state of New Jersey or various prosecutorial or law enforcement agencies.  That's true.

But nevertheless it does create more of an interest of New Jersey stakeholders in the outcome of this issue certainly than the equivalent stakeholders in Pennsylvania who will be,

you know, nothing but a bystander and uninterested in the outcome of a dispute that impacts New Jersey.  So I think that's the way in which it's relevant.

THE COURT:  Why would Pennsylvania people be just bystanders?  In what sense?

MR. ROONEY:  Because we're not dealing with Pennsylvania residents, we're not dealing with proceedings in their criminal courts, we're not dealing with family members that are impacted by the detention of Pennsylvania folks at Moshannon, and we're not dealing with law enforcement agencies or prosecutorial agencies that need to devote resources to, you know, coming up with a workaround for the inability to put somebody on a Zoom link.

I don't think that the interest of the residents of Pennsylvania, the citizens of Pennsylvania, have anything like that, which the citizens of New Jersey do.

THE COURT:  Right.  But do Pennsylvanians not have an interest in the manner in which a facility in their district functions?

MR. ROONEY:  I think all citizens have an interest in making sure their government facilities comply with the law.  I would certainly agree with that.  That would be true of Pennsylvania as it would of New Jersey.

What I'm saying is that New Jersey has something more than the interest of the Pennsylvania citizens, which is what

I have described.

THE COURT:  So the New Jersey interest is premised on the idea that the people we're talking about are New Jersey residents.

MR. HIRST:  Yes.

THE COURT:  Would this case be different, in your judgment, if the Pennsylvania facility were a state facility?

MR. ROONEY:  Well, we wouldn't be suing the federal government if it was state facility, but I suppose the citizens of Pennsylvania would have a moderately greater interest if it was a facility run by their own state government as opposed to the United States.  I would agree with that.  It's not our facts, but I would agree with that.

Again, it's not -- and therefore perhaps their budget would be more at issue if we're talking about resources.  Again, those are not our facts and we're dealing with a United States-operated facility.

THE COURT:  What's the story on these defendants?  I'm not asking you -- you of course will be very careful about not providing attorney-client information of course or work product, but the defendants are each non-Western District of Pennsylvania defendants?

MR. ROONEY:  Correct.

THE COURT:  How did we end up with that?  It's a strange lineup.  It's candidly -- it's not the lineup I would

have expected.

In a case like this I would have expected some of the defendants you cite, the Department of Homeland Security and the secretary of Homeland Security, I would have also expected the person who runs the facility, somebody -- I would have certainly expected somebody based in the Western District of Pennsylvania.  And so you of course, as the saying goes, are the master of your complaint.

On the other hand, it is surprising to see no one from the Western District of Pennsylvania in the caption.  You don't have to shed light on that of course if it would trench upon attorney-client privileges of either of the major kinds, but what's going on with that?

MR. ROONEY:  I'll answer as best I can.  We named as defendants those we perceive to be responsible for the policy and that's the federal government agencies.

Now, the only person that we didn't name, to my knowledge, is the private for-profit company that operates the facility under contract with the defendants and pursuant to instruction given by the defendants.

We didn't think that was necessary or appropriate because we thought this issue was derived from policy set by the United States, and that's why we named the United States as a defendant.

THE COURT:  Right.  But does the United States not have

any on-scene official?

MR. ROONEY:  My understanding is that they do not and they have people who may be there on a temporary basis.  You may have someone there for a few days.

My co-counsel reminds me that in the various back-and-forth between the parties that led up to the filing of the litigation that when we reached out to the private for-profit company that runs the facility about the lack of access, they said, "See ICE.  ICE sets this policy."

So, again, that's why we sued ICE.

THE COURT:  Right.  No, no, I hear that.  I assume that's the case.  I see what you've said about the contractual right of control being located in the federal government.

MR. ROONEY:  Yes.

THE COURT:  It's just a question of -- it's just not seeing what I imagined I would see, which is some local federal official.  I don't doubt that the contractual control --

MR. ROONEY:  I'm just reporting to Your Honor what I understand to be the case.  And we haven't had discovery, but from what I understand to be the case, there is no ICE official stationed at that facility permanently.

There's not somebody with an ICE paycheck or a federal government paycheck that comes to work there every day.  They do visit periodically and they may visit for a series of days,

but they operate out of the Philadelphia office.

That's my understanding.

THE COURT:  Mr. Rooney, anything else?  I don't mean to cut you off if you want to keep proceeding.

MR. ROONEY:  No.  I'll just close again by extending my apologies.  We have some law students in the courtroom, as you heard, and I will give them some advice of what not to do when we debrief after this.

THE COURT:  Mr. Rooney, I told you you're good, you're good, you're good.  I assure you entirely.

MR. ROONEY:  Okay.  Thank you.

THE COURT:  One of the lessons for the law students is this is a hard profession.  What he's doing is extremely hard.

I'll tell you candidly I think the case is beautifully argued here today and on the papers by both sides.  It just is.  That's the core lesson to take away.

I think it's also -- the law students saw the papers that Mr. Hirst and his colleague wrote that allude in a white-glove, ginger way of the excellence and prominence of Mr. Rooney's firm.

And you're a wonderful exemplar of it.  All good.

MR. ROONEY:  Thank you, Your Honor.  I appreciate that.

THE COURT:  Not in the slightest.  I assure you, all good.

MR. ROONEY:  I'll just close by saying we had always

conceived that this is a New Jersey centric issue because of the class, the plaintiffs, the proceedings in New Jersey state municipal court, and the necessity to get injunctive relief just to let these folks get on a Zoom link and appear in those proceedings to get their matters resolved.  We think the motion should be denied.

Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Hirst, can I ask you something before -- I'm going to ask you more substantively -- I'm going to ask you substantively on the motion if you want to say anything else.

Have the parties engaged -- I don't want to know.  I don't want to know anything about the inside of them.  I don't want to.  But have the parties engaged in real settlement conversations?

MR. HIRST:  Would you like me to use the podium, Your Honor?

THE COURT:  Wherever is more comfortable for you.

MR. HIRST:  Early on in the litigation Magistrate Judge Wettre reached out and scheduled a settlement conference.  I think at that conference she was the first to admit that that might have been a bit early so she scheduled a later conference which she referred to as a fact-finding session, essentially, to learn more about the case and see if there's any room for settlement.

We have discussed settlement with our client.  They are not -- we haven't shut the door on that option.  That's something we would be willing to consider, depending on what plaintiffs are offering; but we haven't engaged in any substantive conversations with the other side, Your Honor.

MR. ROONEY:  Forgive me if you said this, but I will just add we do have another date on the calendar with Judge Wettre to go through this, which is coming up shortly.

THE COURT:  Mr. Rooney, do you think there's any possibility of a quick settlement here?  Please don't tell me anything about the substance of any conversations of course or your own position, but do you think there's the possibility of a quick settlement here?

MR. ROONEY:  I'll pause and see if my co-counsel are gonna kick me under the table, but it's really difficult for me to say to represent to the Court that there's a realistic possibility at the moment of settlement.  We really haven't had substantive conversations about it.  I don't know.

THE COURT:  Okay.  All right.  I got it.  Thank you.

Mr. Hirst, do you want to respond to Mr. Rooney in any way?

MR. HIRST:  If I may, Your Honor.

THE COURT:  Yes.

MR. HIRST:  I just want to respond to a few of the points my friend raised during his argument.

One thing he talked about was the -- you know, the limitless resources of the U.S. Government versus indigent plaintiffs.  That's a point he raised in his response to our motion.

THE COURT:  That's when you came back by saying that he worked for one of the great firms in the state that I just alluded to.

MR. HIRST:  Yes.  But I think, if anything, that also points to the discrepancy between the resources of the government and what he's describing as his indigent, non-citizen clients.  That's all the more reason to transfer the case to the location where all those non-citizen clients are housed, which is the Western District of Pennsylvania.

So, yes, there was much made in the briefing about the convenience of counsel, but in terms of the convenience of parties and where the witnesses are actually located, the entire putative class is located in the Western District of Pennsylvania.

One other point my friend raises that I'd like to respond to is he noted that they didn't name anybody in the Western District of Pennsylvania because to their knowledge nobody from ICE works there.

ICE does have an enforcement and removal operations component embedded at Moshannon.  But more to Your Honor's point about whether this would require -- whether adjudicating

this claim would require delving into the facts, regardless of who makes the ultimate call, as Your Honor noted, the factual issues concerning what resources are available, what resources can be reallocated, what the resources are currently tied up in, how much it would cost to build out the facility to accommodate the relief their asking for, whether that can be done and still maintain the medium-high security rating that needs to be maintained at that facility, those are all factual questions that need to be resolved based on information that's at Moshannon.

So even if it is a remote supervisory official who needs to make that call, all that information and all the witnesses with that information are located at Moshannon.

THE COURT:  I think that's maybe -- it's one of the hardest points for the plaintiffs' argument.  I think the thing that makes it so hard is that that could come out, in the plaintiffs' view, in a very easy way.

It could be that, as the complaint says, it's nonsensical to argue that there's a burden on resource allocation that has a cascade effect on other aspects of how the facility is run.  But the question of how institutions are run and what the constitutional minimum with respect to *Mathews v. Eldridge* process is, those are fact-laden questions, I would think.

Now, those questions could be very easily won by the

plaintiff or they could be enormously complex for the plaintiff or the defendant, but there's a pretty high likelihood, assuming that one gets past the 12(b)(6) situation, of real looking at what's going on in the institution.

That's not the kind of thing that usually takes place from a couple hundred miles away.  It's usually the kind of thing that takes place nearby.

MR. HIRST:  Finally, Your Honor, I just want to allude to my friend's point about us not identifying witnesses that are located in the Western District of Pennsylvania.  We were just served with this complaint a little over a month ago, so we haven't identified witnesses yet.

One thing I will say in terms of the witnesses they identify located here in New Jersey, if you look at a lot of those declarations, those declarations are based on conversations they had with detainees located at Moshannon and staff located at Moshannon.

The government doesn't see why deference should be given to witnesses who are providing secondhand testimony as opposed to witnesses who are on the ground who work at the facility, who are detained at the facility and know intimately what's going on.

I think that's all I have, Your Honor.

THE COURT:  All right.  Mr. Hirst, thank you very much.

Mr. Rooney, did you want to respond to any aspect of that?

MR. ROONEY:  Just briefly.  I'll do it from counsel table, if that's okay.

THE COURT:  Sure.

MR. ROONEY:  My recollection of reading the case law, the 1404 case law that the convenience of the witnesses is -- it really focuses on non-party witnesses who may be beyond the subpoena power of the Court and who are not under the control of the parties.

THE COURT:  Right.

MR. ROONEY:  I don't think we're talking about those kinds of witnesses here.  Frankly, with the exception of some of our witnesses who are in New Jersey and are non-parties, I'm not saying they couldn't necessarily be provided in the Western District of Pennsylvania but they are the only third-party witnesses of which I have knowledge.

THE COURT:  That's basically right.  I think the letter of *Jumara* is that the convenience of the parties is one thing but the convenience of the witnesses only matters to the extent the witnesses would not appear for a factual finding.

And so it goes to your point, Mr. Rooney, about people being beyond the subpoena power of the court; but if that's not the situation, that factor just washes away.

MR. ROONEY:  Exactly, Your Honor.  Thank you.

THE COURT:  Anything else, Mr. Rooney?

MR. ROONEY:  No.  That was it, Your Honor, thank you.

THE COURT:  Mr. Hirst, anything from you?

MR. HIRST:  Nothing from me, Your Honor.

THE COURT:  Okay.  I'm gonna grant the motion to transfer, and I'll tell you briefly why.  I haven't pre-written an opinion.  I'll give you my thoughts verbally. They will be as a result of, not having an opinion written, a little bit on the less formal and perhaps orderly side, so I'll give it to you.

First of all, both parties see this as a case in which venue is proper in the Western District of Pennsylvania, so we're talking -- as Mr. Rooney rightly said at the outset, we're talking about a 1404(a) kind of case.

Under *Jumara* certain things are perfectly clear. First, the burden is on the party seeking transfer, which is to say the defendants here.  Secondarily, this is an area under *Stewart*, under *Van Dusen*, where the court has, I have, a wide discretion in terms of deciding whether to transfer the case or not.

Judge Becker in *Jumara* suggests that it is preferable to have a written opinion to tack through all of the factors. I hear that.  I also understand and appreciate that the plaintiffs are -- have worked very hard until now to tee up a case that they want to move very quickly.

In the nature of things, written opinions take longer than oral opinions, and so I'm giving you my decision now so you can take it as makes sense for you.

I also was scheduled this morning to start a month-long-plus triple murder trial.  It's now been deferred by a week, but I will be busy, and I don't want my busyness and slowness to impact the pace of the plaintiff pursuing any options they want to pursue.

I'm not gonna issue a written opinion, but Judge Becker's opinion does -- in *Jumara*, Judge Becker's opinion does very strongly encourage district courts to tick through all the factors.  My sense is not what matters is that it's written but that I go through the factors and I'll do that now.

The first factor is the plaintiffs' choice.  The plaintiff is right that the standard invoked by the Third Circuit since the late 60's or early 70's is that there be a quote, unquote -- that the plaintiffs' choice is quote, unquote, paramount.

On the other hand, as the defendant rightly points out, I've held in the *Care One* case and it's I think deeply rooted in the case law that the plaintiffs' choice is, quote, not dispositive.  Indeed, if it were, there would be no such thing as a 1404(a) possibility of transfer.  There would be no jurisprudence in this area.

A little bit less weight is accorded to the plaintiffs' choice of forum if the choice is less natural, less organic, less genuinely connected to the district other than the fact of filing in the district.

I think that the likelihood that the organizational plaintiff is an Article III plaintiff in this case is quite low.  And I appreciate Mr. Rooney's arguments about the -- it's not fully circular, as he rightly pointed out.

On the other hand, it does have many of the vices emphasized by the Supreme Court in the *FDA* case, and I appreciate Mr. Rooney's point that this hasn't been teed up because we're not in a 12(b)(2) context.

I also appreciate his point that the defendant could have moved, although the case has been pending for five and a half or seven and a half weeks, could have moved already for 12(b)(2) dismissal of that plaintiff.

But I have my own obligation under Article III to inquire as to whether that's an appropriate plaintiff, which is to say one with standing.  My sense is there's a very low likelihood.

It's just a tentative conclusion.  It's not one that would bind anyone anywhere else and it hasn't been briefed. But my sense is the organizational plaintiff is going to have a very hard time maintaining standing.

So when I think about the plaintiffs' choice here, I

don't fully pull out of my mind the organizational plaintiff but I reduce the import of the organizational plaintiff because of a sense that the likelihood is that that plaintiff is not gonna be in the case.

In terms of natural and organic connections to the state, there's certainly an organic connection in the sense that the putative class plaintiffs were living in New Jersey, and that matters here.

At the same time, they are currently living in Pennsylvania.  There's a little debate about what their residence is.  And I think the *Keys* case, which is cited by the plaintiff for the proposition that their residence is New Jersey is actually pretty complicated.  It's pretty complicated for the reasons suggested by the defendant -- excuse me, the defendants in their reply brief.

It's a close and hard question, and it's not even clear that the analysis that is alluded to in *Keys* applies here in the *Jumara* context.

What I would simply note is the plaintiffs have some connections to New Jersey and the plaintiffs have some connection to Pennsylvania.  Aside from the plaintiffs having that dual connection to New Jersey and Pennsylvania, there is certainly a knock-on effect in New Jersey from the approach taken by the defendants, whether it's policy or practice or something else in the state.

So what I would say is the plaintiffs' choice, always important.  The plaintiffs' choice weighs a little bit less heavily here in the plaintiffs' favor than it otherwise -- than it sometimes does because the connections to this case are not overwhelming or very strong but they are certainly there.

There's the knock-on effects, there's the connection that the plaintiffs have to New Jersey, and that all counts in the favor of keeping this case in New Jersey.  It just doesn't weigh as heavily as it does in a case where there is clearly a natural set of connections to the forum district.

The second factor in *Jumara* is the defendants' choice. This is not typically a very important factor, and it's not very important here in my mind, either.  It's not a very important factor because it's tautological, and virtually every case by definition the defendant is moving to move on from the district it's in and so its choice can't loom very large.  Otherwise all these cases would come out in the same way.

Flipside of the plaintiff having connections here but not the strongest ones, the defendants' choice gets a little more weight than it normally gets because the defendant does have some real things to say about a connection to the Western District of Pennsylvania, many of which have been recited by Mr. Hirst that don't need to be belabored now.

There are what the courts call, quote, natural and strong connections, end quote, between the Western District of Pennsylvania and this case. And so while in general the defendants' preference doesn't get much weight, it gets a little bit more weight here than it otherwise would get.

So those are the first two factors, as I see them.

The third factor cuts very strongly, in my judgment, in favor of transfer to the Western District of Pennsylvania. There is an underdeveloped jurisprudence as to where a claim arises for the purposes of 1404(a) transfer questions, and it is just super hard to think this through.

You could imagine, for example, by analogy to the restatement first of choice of law asking where the last bit of a cause of action took place. You could imagine many, many other kinds of approaches.

But here I don't think there's any realistic way to imagine that this claim didn't arise in the Western District of Pennsylvania. It's where the facility's policy is being implemented, it's where the plaintiffs are now, it's where the deprivation is being first felt, and it's where the remedy would run to, which is another way of knowing that the claim is focused there.

It's also the case that this policy may be uniquely applied in the Western District of Pennsylvania. That's at least a point that is gestured to by the defendants. I'm not

sure if it's uniquely in the Western District of Pennsylvania based on what they have cited.

What they, the defendants, have cited is a different way which per the plaintiffs things are handled in Buffalo and Elizabeth; but that relative uniqueness only underscores that the claim is simply arising in any practical operative facts, core-of-the-issue kind of way in the Western District of Pennsylvania. And that cuts, in my judgment, pretty strongly in favor of the case being transferred.

The convenience of the parties here, it's a complicated issue. It's complicated any number of ways, but the convenience of the United States is not terribly important, I agree with that.

The convenience of the plaintiffs for the reasons identified by Mr. Hirst strike me as a strange invocation that things are more convenient somehow for the plaintiffs here. They are at least for now detained in the Western District of Pennsylvania.

What I would mainly say about the convenience of the parties point is that it's mostly an equipoise. The fact that it's mostly an equipoise just tends to underscore that the locus of this case is in the Western District of Pennsylvania.

The plaintiffs are all there and the defendants -- it's not very important where they are because, as Mr. Rooney well argues, they are the United States and they can appear

virtually anywhere without much strain.

But it underscores the inorganic quality, in my judgment, of being here in New Jersey when the convenience of the parties actually is a strange fit.  The plaintiffs are not here in New Jersey.  They are in Pennsylvania.

For reasons Mr. Rooney pointed out, I think witness convenience just flat doesn't matter here.  Witness convenience is about being beyond the subpoena power of the court, and so that simply doesn't loom large or, excuse me, doesn't loom at all.

Books and records is the same piece, which is to say there's no realistic possibility, I don't think, that there are books or records or documents that the Court couldn't use its power to get for the parties wherever this case goes forward.

The local interest piece and the practical considerations piece, those largely run together, in my mind. Both states have something of a local interest here.

New Jersey certainly has an interest in the efficient and just administration of the criminal process.  That is just a paramount interest that is important in New Jersey in a way that's different than elsewhere.

While I appreciate Mr. Rooney's point, it's a good point that this is a federal facility in the Western District of Pennsylvania.  That doesn't mean there's no local interest

in the manner in which an important local institution is run.

The cases speak about the local interest in local juries deciding things, and I've written a bit about that particular aspect of local juries looming large for this purpose.

But it's also the case that it is important that issues of local import get resolved not by local officials, federal judges are not local officials whether they sit in New Jersey or Pennsylvania or anywhere else, but they get resolved in local courtrooms where local people can walk through the back doors and see what's happening and have an ability to understand what's happening in their own communities.

I think that part of the reason the local interest/practical considerations factor looms large here is that it is almost inevitably the case, as I look to the substantive law, *Mathews v. Eldridge* and beyond, that there will need to be meaningful and potentially highly extensive factfinding about how the inside of this facility functions and what the relevant trade-offs are or not.

That's the kind of factfinding that is the sort of paradigmatic practical consideration under *Jumara* and one also that in my judgment there's a local interest in having go forward where the public can watch it happen as the Court finds facts or doesn't about local witnesses, people from that particular community who are gonna speak to what is happening.

I appreciate the point that Mr. Rooney's co-counsel mentioned, which I think is a very good and important point, that there's also gonna need to be factfinding potentially here in New Jersey, because that's the other part of the *Mathews v. Eldridge* test.  I don't doubt that.

But that kind of factfinding is a quite different kind of factfinding.  It's a kind of factfinding about people showing up or not showing up that is necessarily less complex, necessarily less subject to contestation.

It's factfinding that says court records said this person didn't have a lawyer, didn't appear.  Court records or maybe documentary records of the kind the plaintiffs put in front of the Court say, "Look, we" -- the state judicial officer -- "e-mailed over to a federal official to try and get this person to appear remotely and they didn't."

I appreciate the point.  I think, as I said, it's a very well-made point that there is some factfinding in both places, but the factfinding in the Western District of Pennsylvania is much more complex.  It's much more susceptible of doubt.  It's much more need of live testimony and cross-examination.

That's factfinding related to how the institution functions and what the trade-offs of certain choices may or may not be versus the kind of factfinding that's gonna matter in New Jersey which is closer to being an on/off switch, did

somebody appear or not.

Now, that is true I think to an even greater extent when one thinks about the remedy that is being sought here by the plaintiff.  The plaintiff is essentially seeking in its prayer for relief an injunction that is what used to be called a structural injunction.  It's an injunction that would involve federal court monitoring of a prison for five years plus.

I appreciate what Mr. Rooney is saying, which is maybe the nature of the monitoring is not an in-person monitor, maybe it's books and records and that's that, to which I would just say that's not what the complaint says.  It doesn't limit itself to that.

In any event, multi-year monitoring of a detention facility is the sort of thing that very clearly and predictably could require years and years and years of litigation and hearings and enforcement proceedings and changes to decrees, et cetera, et cetera.

That's the kind of multi-year endeavor that is much more in the nature of practical considerations, as *Jumara* puts it, much more the sort of thing that should go forward in the same district versus the sort of thing that in my judgment makes sense from a practical perspective or the interest of justice from a far-away location.

There's also, as I noted, a local interest in the

public being able to see what's going on in terms of a multi-year monitorship of a Pennsylvania facility.

I'd add in terms of that -- and this comes back to Mr. Hirst's point where he alluded to the footnote that is in the Department of Homeland Security's brief.  The knock-on effects here on the management and functioning of the facility of any remedy would concern people whose residence -- who were living in New Jersey before they were moved to Pennsylvania and also some other people.  Indeed it seems a lot of other people.

So while I appreciate the point that the local interest in New Jersey, this is Mr. Rooney's point, is heightened by the way in which the class has been structured, it seems to me that this is not a set of effects that will be felt only in New Jersey, both because of the need to look deep under the hood of how the facility is functioning but also because there are knock-on effects for people who aren't part of the class who are in the facility.

The next factor is court congestion.  The United States argues that this factor favors moving the case essentially because district judges in New Jersey have about four times as many cases, five times as many cases as district judges in the Western District of Pennsylvania.  True.

I'm essentially in the middle of a murder trial and the briefing came in this morning and here we are at 4:15.  I

would not let this be a factor, and this case is palpably a very important one related to the points I made in the *Care One* case.

I don't think this factor favors transfer because if I kept the case I would make sure that I handle it with as much energy as I can humanly muster.

The judgment enforcement factor, it came up a little bit before in the conversation with largely Mr. Hirst. I think judgment enforcement doesn't matter in a strictly formal sense because, as we noted, there's no doubt that a judgment entered against the defendants would be complied with by the defendants whether the identity of the district judge is New Jersey or Western District of Pennsylvania.

But the readiness of judicial enforcement is an important factor and ready enforcement of what is suggested as a five-plus-year structural injunction is much more sensible in my judgment, closer to home.  It is just more ready enforcement.

Public policy doesn't matter, I don't think.  This is a federal law case.  There are small references in the briefing to the New Jersey state constitution.  For example, the need to treat people in an appropriate way and the impact on victims, which are well made by Mr. Rooney and his colleagues, but fundamentally the public policy factor does not matter here.

This is a federal law case.  Nobody has pointed out meaningful distinctions with respect to public policy, and indeed the District of New Jersey and the Western District of Pennsylvania, to the extent federal law differences could conceivably be chalked up as relevant under the public policy factors, those federal law differences are gonna not be meaningful because the district judge in the Western District of Pennsylvania and I would be both operating under the same body of Third Circuit law.

I've done this a little bit out of order, but finally this was, as noted earlier by Mr. Rooney in his rebuttal, this is not a diversity case.  And because it is not a diversity case, the familiarity that a judge has or doesn't have with state law just doesn't matter.

So those are the factors.  In the very final analysis, the balancing of them needs doing by the district judge, and my sense of the balance is that while the plaintiff gets to choose where it wants to sue and has made a choice here, this case is overwhelmingly based in the Western District of Pennsylvania in terms of where the plaintiffs are, in terms of where the facility is that's imposing the policy, in terms of where the front-line violation that is alleged is taking place, and, importantly, in terms of the good deal of the factfinding that is likely to be necessary in terms of figuring out if there has or has not been a violation.  And if

there has been a violation, a good deal of the multi-year monitoring that is taking place.

All of that tells me that while the plaintiff gets to choose where it files and while the defendants certainly, certainly have the burden of overcoming that initial filing, my own judgment and the exercise of my discretion is that this is a case whose overwhelming locus is in the Western District of Pennsylvania and that this case should therefore be transferred there.

I have spoken a bit in shorthand for reasons that I alluded to at the top, but that's my judgment here.

Mr. Rooney, I want to ask you something.  I want to be respectful of your possible desire to appeal this decision, and there are all kinds of complexities about appeal of transfer orders.

Do you want me to stay my decision here, or do you want me to simply enter an order transferring it?  I don't want to slow you down.

On the other hand, I don't want to box you out of an appellate right and moving at a speed that prevents you from appealing if you want to.

MR. ROONEY:  We need to consider that.  I appreciate what Your Honor is saying.  I do appreciate that.  Can we let Your Honor know tomorrow?  I realize --

THE COURT:  Sure.

MR. ROONEY:  That will allow us to chew on this overnight and figure out which approach we'd like to take.

THE COURT:  That's fine by me.  Listen, today is Monday.  Why don't you file -- I don't want to rush you unnecessarily.

If you want to take an appeal, I want to set things up so that you don't get boxed out of an appeal.  On the other hand, if you say, "Gee, I want to get rolling here" because you've been very diligent in trying to get rolling, I don't want to mess that up.

Do you want to file a letter by Wednesday at noon telling me how you want to proceed?

MR. ROONEY:  Yes.  Absolutely.

THE COURT:  I don't mean in such a letter that you need to explain yourself.  I've made my decision.  You can just tell me that I should enter the transfer order in which case I will and I'll do it right away; or if you want to take an appeal, you should tell me how that is best done.

It's just complicated.  I don't know exactly how to do it, but there are, I know, ways to do it.  There's history of people having cases transferred and then seeking to appeal and then having a court of appeals say:  Gee, the case is already gone.

I don't want you to have to litigate through that complexity if indeed you want to appeal.

MR. ROONEY:  Yes.  I appreciate that, Your Honor.  If we take that route, we'd ask Your Honor to stay the clerk's implementation of the transfer itself, I think would be the issue.

THE COURT:  So, bottom line, I've made a decision in my discretion about transferring the case.  I have not, have not, have not, have not issued such an order and I will not do so.

I'll expect to hear from you Wednesday by noon with a filing on the docket, and just either tell me "We, the plaintiffs, will not be appealing, so enter an order."  In which case I'll enter a one-sentence order.  Or "We will be appealing.  Here is what we, the plaintiffs, propose you should do."

If it's the latter, it would be good to know if you have time what your adversary's position is, but I suspect the mechanism of entering an order, staying it so that the court of appeals can weigh in is something that would be perfectly comfortable by your adversary, but I'll await hearing from you.

MR. ROONEY:  Okay.  Thank you, Your Honor.

THE COURT:  All right.

While we are here together, anything else, Mr. Rooney, we should cover, from your perspective?

MR. ROONEY:  No, thank you, Your Honor.

THE COURT:  All these students are all getting back on

the train tonight?  What's happening here?

MS. LIEU:  We will be driving back, Your Honor.

THE COURT:  Safe trip home.

MS. LIEU:  We'll contend with traffic.

THE COURT:  I think you may want to hang out for about an hour and a half before anyone gets in the car.

Anything from the Department of Homeland Security?

MR. HIRST:  Nothing from us, Your Honor.

THE COURT:  We are adjourned.  I will look for your filing on Wednesday.  Thank you all very much.

THE DEPUTY CLERK:  All rise.

(Which were all the proceedings held in the above-entitled matter on said date.)

*   *   *   *   *

## FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court Reporter of the United States District Court for the District of New Jersey, do hereby certify that the foregoing proceedings are a true and accurate transcript from the record of proceedings in the above-entitled matter.


*/S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

Official U.S. District Court Reporter ~

District of New Jersey


DATED this November 1, 2024

***United States District Court***
***District of New Jersey***